Richard F. Horowitz (RH-6451)
Clifford J. Bond (CB-4679)
HELLER HOROWITZ & FEIT, P.C.
292 Madison Avenue
New York, New York 10017
(212) 685-7600

**Attorneys for Plaintiff**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

RAMESH MENON,

                        **Plaintiff,**

          -against-

CITIGROUP GLOBAL MARKETS INC.
and CITIGROUP INC.,

                        **Defendants.**

-----------------------------------------------------------X

*Judge Hellerstein*

# 05 CV 8963

CASE NUMBER:

COMPLAINT

RECEIVED
OCT 21 2005
U.S.D.C. S.D.N.Y.
CASHIERS

## Summary of Claim

1.    This action is based on Citigroup's racial and national origin discrimination against Plaintiff in violation of 42 U.S.C. § 1981.[1]  After his administrative remedies have been exhausted, Plaintiff intends to amend this Complaint to add additional claims based on Citigroup's discriminatory conduct under additional relevant Federal, New York State and New York City anti-discrimination laws, including, but not limited to, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law and the New York City Administrative Code.

---

[1]    For purposes of this Complaint, the term "Citigroup" includes Defendants Citigroup Inc. and Citigroup Global Markets Inc. and each of their predecessors.

2.      Starting in late 1997 and continuing through the present (the "Discrimination Period"), Citigroup has systematically and routinely underpaid Plaintiff and passed Plaintiff over for promotions to positions for which Plaintiff had been and continues to be eminently qualified; indeed, Plaintiff was and is more qualified than the persons with whom Citigroup chose to fill the positions.

3.      Upon information and belief, Plaintiff was and continues to be underpaid and passed over for promotions to which he was and is entitled, due to intentional discrimination against Plaintiff based on Plaintiff's race and national origin.

4.      During the Discrimination Period, numerous positions senior to Plaintiff's positions and paying higher compensation than Plaintiff was receiving became available. Plaintiff received none of them.  Instead, the promotions to which Plaintiff was entitled and for which he was the most qualified candidate went to white males who were generally less qualified than Plaintiff.

5.      Rather than receiving the compensation and promotions which he had earned and to which he was entitled, Plaintiff recently was demoted and has been subject to improper and detrimental restraints on his business conduct in what, upon information and belief, are retaliatory steps taken by Citigroup management in response to complaints Plaintiff has made to Citigroup's Human Resources Department, to Citigroup management directly and to the United States Equal Employment Opportunity Commission ("EEOC") about the environment of discrimination in Plaintiff's department, and the direct effect such discrimination has had upon Plaintiff.

6.    All of this has occurred despite the fact, that from its inception in 1998 through 2004, the revenues generated by the U.S. Structured Investments Group (the "Group"), which Plaintiff was instrumental in creating, and of which at all relevant times Plaintiff has been in charge, have increased by over 2000% from approximately $11 million in 1998 to approximately $225 million in 2004.

7.    So far in 2005, the earnings of Plaintiff's Group far exceed the earnings of the Group's industry competitors.

8.    The U.S. Equity Derivatives Department (the "Department"), of which Plaintiff's Group is a part, maintains an environment of discrimination against women and minorities.  The Department is dominated by white males who disproportionately are promoted to senior management positions.  Upon information and belief, at the same time (during the Discrimination Period), a disproportionate number of equally or better qualified women and members of minority groups have been fired, demoted, forced out of Citigroup or otherwise victimized by discrimination.

9.    Notwithstanding the huge revenues that Plaintiff's Group has generated for Citigroup, and the amazing increase in those revenues, Plaintiff's annual bonus and overall compensation as a percentage of such revenues has decreased dramatically from 5.9% in 1998 to just 1.0% in 2004.

10.    Upon information and belief, the compensation that Plaintiff has received for his services, while not insubstantial, is well below industry-wide compensation received by those in positions akin to Plaintiff's and with Plaintiff's production.

3

11.     Upon information and belief, Plaintiff's compensation also is well below compensation received by others at Citigroup who work in similar positions and have similar production.

12.     The undercompensation of Plaintiff is, upon information and belief, a further manifestation of Plaintiff's Department's discriminatory conduct.

13.     Due to Citigroup's continued discrimination against Plaintiff, Plaintiff has been denied numerous available promotions that he has earned and to which he was and is entitled, Plaintiff has been under-compensated by tens of millions of dollars, Plaintiff has been wrongfully demoted, Plaintiff has been taken advantage of -- both through the under-compensated and un-compensated use by Citigroup of Plaintiff's skills and through false representations by U.S. managers of forthcoming promotions and compensation increases in order to keep Plaintiff from moving elsewhere and to otherwise placate him -- and the progress of Plaintiff's career has been significantly hindered.

14.     Currently, Plaintiff has been subject to hypocritical hyper-vigilance by his superiors, who have imposed on Plaintiff requirements that have never before been imposed on Plaintiff, that, upon information and belief, are not imposed on Plaintiff's peers at Citigroup and that are severely hindering Plaintiff's ability to successfully perform his duties.

15.     Upon information and belief, this hypocritical hyper-vigilance is in retaliation for the discrimination complaints made by Plaintiff to Citigroup and to the EEOC.

### Parties

16.     Plaintiff, Ramesh Menon is a naturalized U.S. citizen, who was born in India and is of Indian descent. Plaintiff resides in the State of New York and is employed in the

4

City of New York. Plaintiff is currently employed by Citigroup Global Markets Inc. as the Head of U.S. Structured Products in the Global Equity Derivatives Department.

17.     Defendant Citigroup Inc. is, upon information and belief, a corporation duly organized under the laws of the State of New York, with offices located in the City and State of New York.

18.     Defendant Citigroup Global Markets Inc., is, upon information and belief, a division of Citigroup Inc., duly organized under the laws of the State of New York, with offices located in the City and State of New York.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343(a)(4).

20.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) in that Plaintiff works in this State and district, and the discriminatory conduct took place and continues to take place within this State and district.

## Relevant Background/The Specific Discriminatory Conduct

### *Relevant Employment History*

21.     On or about April 1, 1996, Plaintiff left his prior employment at Bear Stearns & Co. and joined Salomon Brothers ("Salomon") as Global Head of Structured Products in the Global Equity Derivatives Group. He decided to join Salomon, because he believed that Salomon offered better growth opportunities in the structured products business than did Bear Stearns.

5

22.     In late 1997, Salomon was purchased by Travelers Group and merged with

Smith Barney. In 1998, Travelers Group merged with Smith Barney. In 1998, Travelers Group

merged with Citicorp and took the Citigroup name.

*Post Merger Co-Head of U.S. Structured Products*
*Position Goes to Less Qualified Candidate*

23.     In late 1997, prior to the closing of the merger of Salomon with Smith

Barney, as Salomon's Head of Structured Products, Plaintiff developed and presented the

organizational structure that was adopted and implemented by Salomon Smith Barney post-

merger, in late 1997. This structure involved the combining of structured investments, hedging

and monetization and corporate equity derivative products into one group.

24.     As Salomon's Global Head of Structured Products, and as the primary

creator of this group, Plaintiff was the most logical candidate for the post-merger position of

Head or Co-Head of this newly formed U.S. Structured Products Group in Salomon Smith

Barney, yet he did not get the promotion. Instead, the position went to Joseph Elmlinger, a white

male who, along with Andrew Constan, another white male, was responsible for dramatic losses

of approximately $50 to $75 million in equity derivatives. The other Co-Head was Thomas

Petrone, also a white male.

25.     Prior to being promoted, Mr. Elmlinger was the junior single stock equity

derivatives trader, which was a position that was considerably subordinate to Plaintiff's then

position.

6

26.     Andrew Constan was one of four individuals appointed to run global equity derivatives in Salomon Smith Barney.  Prior to the merger, Mr. Constan was the Head of U.S. Single Stock Derivative Equities Trading at Salomon.

27.     When Plaintiff inquired of Mr. Constan why Mr. Elmlinger got the position for which Plaintiff was much more qualified, Mr. Constan told Plaintiff that "Joe" was "his guy."

28.     Upon information and belief, the term "his guy" meant "his white, non-Indian non-other minority guy."

29.     At about the time that Messrs. Elmlinger and Constan were promoted, on or about September 24, 1997, Plaintiff was given subordinate responsibility for the U.S. Structured Investments Origination Desk and was demoted to Co-Head of Structured Investments Origination.  The other Co-Head was Edward Watson, also a white male, who was significantly less experienced than Plaintiff, but had a close relationship to Mr. Petrone.

### The Structured Investments Group Grows Dramatically/Development of Asia Business

30.     Under Plaintiff's leadership, Citigroup's Structured Investments Group has seen dramatic growth.  Specifically, in 1998, the first year that the Group operated, the Group's departmental revenues exceeded $11 million.  This number skyrocketed to approximately $100 million in 2000, approximately $150 million in 2001 through 2003 and approximately $225 million in 2004.  The revenues generated by Plaintiff's Group and Plaintiff's compensation for the period from 1996 through 2004, are charted below:

| Year | Salary | Bonus | Dept. Revenues* | Citigroup Revenues** |
|------|--------|-------|-----------------|----------------------|
| 1996 | 150,000 | 400,000 | N.A. | N.A. |
| 1997 | 150,000 | 400,000 | N.A. | N.A. |
| 1998 | 150,000 | 500,000 | 11,077,925 | 13,094,786 |

| 1999 | 150,000 | 1,100,000 | 52,538,550 | 63,456,133 |
| 2000 | 200,000 | 2,078,500 | 96,782,696 | 108,784,969 |
| 2001 | 200,000 | 1,700,000 | 155,973,955 | 173,440,345 |
| 2002 | 200,000 | 1,235,000 | 144,811,028 | 291,760,341 |
| 2003 | 200,000 | 1,525,000 | 155,509,887 | 214,495,197 |
| 2004 | 200,000 | 2,050,000 | 223,652,936 | 297,652,620 |

\* U.S. Structured Investments only. Does not include revenues generated from other businesses Plaintiff has managed including the Asia business which went from $0 in 2001 to approximately $80 million in the present.

\*\* Total resulting revenue generated across Citigroup

31.     During the three year period between 1998 and 2000 Plaintiff also traveled extensively to Europe and Asia to help develop the framework for the global equity derivatives business.

32.     In 1999, while retaining his responsibilities in the U.S., Plaintiff spent six months away from home in Japan as Co-Head of Japanese Equity Derivatives to correct errors made by Nick Waltner, the other Co-head.

33.     At the end of 1999, Plaintiff was given the title of Managing Director.

34.     In mid-2001, Plaintiff received his only job promotion; he was promoted to Co-Head of Global Structured Products, which effectively made Plaintiff responsible for the Asian structured product business in addition to Plaintiff's U.S. duties.

35.     While continuing to lead substantial growth in Plaintiff's U.S. Group, Plaintiff took the steps necessary to promote the growth of Asia-Pacific Structured Products, the revenues of which increased from $2 million in 2000 to $81 million in 2004. These steps included mitigating the potential damage to the Asian business caused by the unfair demotion by Andrew Constan and Joseph Elmlinger of Harold Kim, an Asian-American and Co-head of Asia-Pacific Equity Derivatives, in favor of the other Co-head, a white male.

8

36.     Plaintiff resurrected Harold Kim's career by naming him the local head of

Structured Products under Plaintiff's direct supervision. The resulting Asian market revenues

that were generated under Plaintiff's leadership are charted below:

| Asia-Pacific Structured Products | |
|---|---|
| Year | Revenues (in MM) |
| 2000 | 2.0 |
| 2001 | 4.7 |
| 2002 | 19.5 |
| 2003 | 46.4 |
| 2004 | 81.0 |

**The Same Less-Qualified Candidate, Joseph Elmlinger,**
**is Promoted to Head of Global Equities**

37.     Notwithstanding Plaintiff's exemplary record in generating tremendous

U.S. and Asia-Pacific revenues and "fixing" the problem in Asia, on or about February 24, 2003,

Joseph Elmlinger was promoted to Head of Global Equities even though Plaintiff was far more

qualified and otherwise more deserving of the promotion than Mr. Elmlinger.  Plaintiff was

informed of this by the outgoing Head, Andrew Constan, who asked Plaintiff to support his

decision.

38.     To make matters worse, not only was Plaintiff passed-up for this

promotion to which he was entitled, but this happened shortly after Plaintiff declined an offer

from a large client firm at a guaranteed compensation almost double that which Plaintiff was

then earning at Citigroup.

39.     After Plaintiff advised Citigroup of this offer, Andrew Constan and Joseph

Elmlinger promised Plaintiff annual compensation of $3 million for 2002.  Plaintiff did not

receive this compensation, and he complained to Arthur Hyde, the then Head of Global Equities,

9

who promised to make amends to Plaintiff, but who himself ended up being fired, along with Mr. Constan, for poor performance.

*Meeting with James Forese/Position of Head of U.S. Equity Derivatives Goes to Someone Else*

      40.    In mid-2003 Plaintiff met with James Forese, still another white male, who was the then new Global Head of Equities. During this meeting, Plaintiff identified the weaknesses and instances of poor management in the equity derivative business, including the flawed strategies implemented by Joseph Elmlinger and Andrew Constan.

      41.    Since Mr. Forese's arrival, four women Managing Directors in the Global Equity Department have left Defendants' employ.

      42.    Due to the efficiencies which Plaintiff had created in Plaintiff's very successful Group, Plaintiff volunteered to take on additional responsibilities. Plaintiff suggested possible changes including making Plaintiff the Head of Global Equity Derivatives, or creating a new position for him such as Head of U.S. Equity Derivatives.

      43.    During this meeting, Mr. Forese conceded that Mr. Elmlinger was a "B" level employee, but put Plaintiff off by asking him to be patient, stating that Plaintiff's aspirations would soon be achieved.

      44.    Shortly thereafter, on or about March 5, 2004, the position of Head of U.S. Equity Derivatives was indeed created but, despite the fact that Plaintiff was widely identified within the Department as being the leading and most qualified candidate for the position, he was again passed-up for the well-deserved promotion to the very position that he suggested be created. That position went to Thomas Petrone and Bret Engelkemier, two less-qualified white

10

males. During the meeting in mid-2003, Mr. Petrone described Mr. Engelkemier as relatively junior and inexperienced.

### *James Forese's Further Broken Promises*

45.    In the fall of 2004, Plaintiff received an offer from a leading global investment bank to head up its global structured products business at a guaranteed minimum compensation of $3.5 million, with target compensation of $4 million and $5 million during the first two years based on meeting certain reasonably obtainable financial targets (and with target compensation of $7 million if Plaintiff was able roughly to match his production at Citigroup).

46.    Plaintiff advised James Forese of this offer, and Mr. Forese asked Plaintiff to stay at Citigroup.

47.    Plaintiff agreed to stay based on Mr. Forese's misrepresentations that Plaintiff's professional and financial goals would be accomplished at Citigroup, and that Plaintiff also would receive more responsibility.

48.    Plaintiff met several other times with Mr. Forese in an attempt to obtain the responsibility and concomitant promotion and salary increase that he had more than earned, but, Mr. Forese's promises notwithstanding, all of these meetings ultimately were to no avail.

### *Mr. Elmlinger Offers Plaintiff the Position of Head of Hybrid Derivatives*

49.    In 2004, Mr. Elmlinger offered Plaintiff the position of Head of Hybrid Derivatives. The offer had a catch, however. In order to get this position, Plaintiff would have had to give up his existing responsibilities because, according to Mr. Elmlinger, Head of Hybrid Derivatives was a "full-time job."

50.     Plaintiff explained to Mr. Elmlinger that, due to common distribution and production elements, Plaintiff saw great utility in managing both the hybrid derivatives business and the global structured products business, and that Plaintiff was capable of managing both at the same time.

51.     Mr. Elmlinger told Plaintiff that Plaintiff could not have both jobs.

52.     Plaintiff declined the offer to run the Hybrid Derivatives business, since it would not have been a promotion and ultimately could have been a step backward.

53.     Apparently, Plaintiff was correct that Hybrid Derivatives could be managed along with another structured products business because, shortly after Plaintiff declined the position, it was given to Richard Burns, another white male, even though Mr. Burns was already and remained the Co-Head of European Equity Derivatives.

54.     Upon information and belief, Plaintiff's employer's implicit position seems to be that white males can handle the dual responsibility, but those of Indian descent, no matter how qualified they may be, cannot.

### After Plaintiff Complained of Discrimination to Human Resources, He was Demoted

55.     Later in 2004, Plaintiff complained to Human Resources that he and others in his department had been discriminated against in respect of promotions and compensation. Plaintiff provided Human Resources with Plaintiff's complete relevant history as well as the Department's history of discriminating against women and minorities.

56.     Human Resources incredibly claimed that it had no records regarding terminations of minorities.

57.     Human Resources also conceded that Plaintiff was poorly paid relative to comparable producers elsewhere within the firm, but took the position that, within Plaintiff's Department, he was well-paid.

58.     Upon information and belief, Plaintiff has not been paid commensurate with other comparable individuals and with the revenues Plaintiff has produced for Citibank, as evidenced by Plaintiff's ever decreasing compensation as a percentage of revenues generated.

59.     Shortly after Plaintiff complained to Human Resources, on or about June 30, 2004, Plaintiff was yet again passed up for a promotion to which he was entitled and for which he was the most qualified candidate.  This time the position that was denied Plaintiff was that of Head of Hybrid Derivatives.

60.     This position instead went to the less qualified white male Richard Burns.

61.     Mr. Forese told Plaintiff that this position was not given to Plaintiff because Richard Burns was "better accepted by the fixed income department for this role."

62.     Upon information and belief, "better accepted..." is code for the "white male" is "better accepted."

63.     On or about February 25, 2005, upon information and belief, in retaliation for Plaintiff's complaint to Human Resources, Citigroup demoted Plaintiff from Head of Global Structured Products to Head of U.S. Structured Products.

64.     In response to Plaintiff's recommendations, the Head of Global Structured Products job was expanded to include responsibility for Europe.  This reconfigured job was given to Richard Burns. This occurred despite the fact that Plaintiff's Group was and continues to be one of the best revenue producers in the entire Department.

13

65.     In fact, in 2004 alone, just prior to Plaintiff's demotion, Plaintiff's Group had earned record revenues of almost $225 million, and combined with Asia, Citigroup achieved revenues of almost $400 million, primarily due to Plaintiff's efforts in the U.S. and Plaintiff's leadership with respect to Asia-Pacific.

66.     In May 2004, Plaintiff submitted a plan to James Forese to grow Global Structured Products revenues (including Europe) to $500 million by the end of 2006. By the end of 2004, Plaintiff's Group was well ahead of schedule and approximately 75% of the way there.

67.     The reason that James Forese gave Plaintiff for again not promoting him and for Plaintiff's subsequent demotion was that it was perceived that Plaintiff had been less engaged in Plaintiff's existing role.  Upon information and belief, this was not the reason for Plaintiff's demotion.   Rather, upon information and belief, the excuse that Plaintiff was less engaged was a contrived effort to cover-up discriminatory conduct against Plaintiff.

68.     The fact was that Plaintiff had been doing his job so well that he had created tremendous efficiencies in his Group and had hired loyal and capable (and mostly minority) personnel who could take on significant responsibility.

69.     At the same time, Plaintiff freed himself up for even greater responsibility which never came. Rather, the promotions went to less-qualified white U.S. born and bred males who, at best, started out as Plaintiff's peers and who were not nearly as successful as Plaintiff had and has been in generating revenues for Citigroup.

70.     In another discriminatory slap in Plaintiff's face, Plaintiff recently learned that the all white male management of Plaintiff's Department intended to give him a permanent office mate, notwithstanding the representations to the contrary by James O' Donnell, the current

14

Head of U.S. Equities and another white male. It is inappropriate and demeaning for an individual of Plaintiff's expertise and experience to be forced to share his office.

71.     Upon information and belief, this was done solely in retaliation to Plaintiff's discrimination complaints.

## Plaintiff's Business Conduct and Discretion is Severely and Detrimentally Curtailed

72.     In the last few months Plaintiff has been subject to hypocritical hyper-vigilance by his superiors and unwarranted restrictions on his business conduct.

73.     In particular: (a) Plaintiff's attendance in the New York offices has been scrutinized at a level higher than ever before, and at a level higher than that of Plaintiff's peers and superiors at Citigroup; (b) despite the fact that this has never been the case before Plaintiff's discrimination complaints, Plaintiff has recently been instructed to curtail his travel and first to get permission from his superiors at Citigroup before traveling out of the country; (c) Plaintiff has been excluded from key presentations being made to internal clients within Citigroup despite the fact that, in the past, he had attended and participated in these meetings; and (d) Plaintiff has been excluded from senior equity management offsite meetings which he always attended and in which he always participated prior to making his discrimination complaints.

74.     This hypocritical hyper-vigilance and these newly contrived restraints on Plaintiff's business activities have made it much more difficult for Plaintiff adequately and efficiently to perform his duties at Citigroup, and are detrimental to both Plaintiff and Citigroup.

75.     Upon information and belief, this hypocritical hyper-vigilance and these newly contrived restraints were put into place by Citigroup solely in retaliation to Plaintiff's

discrimination complaints, and they would not have occurred absent the discrimination complaints.

## The Equity Derivative Department's Culture and History of Discrimination

76.     In addition to the discriminatory conduct directed at Plaintiff, there are numerous examples of other minority group individuals, individuals of foreign descent and women, who have been discriminated against in respect of compensation and promotions. Among others, Trang Chu, Helen Dykhuis, Stacey Herndon, Michele Galiounghi, Michael Warren, Iakov Pevzner, Esther Asher, Gloria Steiner and Oliver Withopf, are all women, ethnic minorities and/or foreign born former Citigroup employees in Plaintiff's department who, upon information and belief, were "laid-off" or forced out by Citigroup U.S. management during the Discrimination Period.

77.     Upon information and belief, proportionately, many fewer white males lost their jobs during the same Discrimination Period.

78.     In fact, most of Plaintiff's white male peers have been promoted to positions of greater stature, responsibility and compensation than Plaintiff, even though the revenues Plaintiff's group has generated during the same Discrimination Period have been extraordinary and far greater than the revenues of these "peers."

79.     All of the current senior managers in Plaintiff's department – Joseph Elmlinger, Richard Burns, Thomas Petrone, Bret Engelkemier, Luke Randell and Justin Kennedy – are white males who began, at best, as Plaintiff's peers.

16

80.     Upon information and belief, the other candidate for a senior position in Plaintiff's Department who also has been demoted by U.S. based management is an individual of Asian origin who very successfully runs the Asian Structured Products business.

81.     Another individual of Indian descent has been passed over for promotions that he has earned and he too is grossly underpaid.  This individual is a senior trader in the Hybrid Derivatives group who consistently brings in annual revenues in excess of $50 million to Citigroup.  As with Plaintiff, this other person of Indian descent is not being supported by Richard Burns and Joseph Elmlinger who continue to favor white males for senior positions over more qualified women and/or minorities.  In fact, his compensation decreased drastically last year, even though his production increased.   The drop in this individual's compensation coincided with Mr. Burns' promotion to Head of the Hybrid Derivatives group.

82.     Furthermore, in 2004, Andrew Constan pressured Plaintiff to terminate the employment of a pregnant minority female employee, who was more than adequately performing her duties.  Plaintiff refused to fire her.

83.     Also, in or about 2002, a top-performing "star" associate in Plaintiff's Group, of Asian origin, expressed a desire for more responsibilities. Plaintiff agreed that this was appropriate and suggested to Mr. Elmlinger that this associate be assigned to the Hedging and Monetization group as a marketer.  Mr. Elmlinger told Plaintiff that this Asian candidate would play well in Hong Kong, but not in the Mid-West, where a portion of the marketing would take place. Accordingly, this employee did not receive the marketing position and he eventually left Citigroup for a position with a competitor; he is the only member of Plaintiff's Group to have left Citigroup over the last eight years.

84.     Another example of the Citigroup Department's mistreatment of women and minorities occurred recently when a top performing female employee in Plaintiff's Group left Citigroup to pursue a career in international diplomacy.  This woman had stock options that should have been treated as vested.  Citigroup initially refused to recognize the options as such.  Plaintiff took up her cause and succeeded in convincing Citigroup to recognize her options as vested.  Upon information and belief, had this woman been a white male, she would not have been treated in such an unprofessional and improper manner.

85.     During discussions in 2005 among existing U.S. Managing Directors concerning promotion of new Managing Directors, a woman whom Plaintiff nominated, who is the top producing salesperson, was ranked lower than a lower-producing white male.  Most of the U.S. Managing Directors are white males.

86.     Citigroup preaches that it is concerned about its image in respect of diversity. Just recently, Citigroup released a so-called "Celebrating our Diversity 2005 Calendar," which identifies numerous women and minority employees of Citigroup.  This calendar is a publicity stunt being used by Citigroup to promote an image of gender and ethnic diversity.

87.     While diversity may perhaps exist elsewhere in Citigroup, it is glaringly absent in the U.S. Equity Derivatives Department, which is notorious for being a "White Men's Club," and in which personnel decisions are made not only by white male U.S. managers but also by white male global equity managers who are based here in New York.  These individuals include, but are not limited to, Joseph Elmlinger and James Forese.

18

## COUNT I

### (Violation of 42 U.S.C. § 1981)

88.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 87 above as if set forth in full herein.

89.     Plaintiff is one of the most successful employees in the entire Equity Derivatives Department. He is largely responsible for the creation of the highly profitable and successful U.S. Structured Products Group and he has made unprecedented profits for Citigroup. Nevertheless, Plaintiff has been unable to obtain well-earned promotions and fair compensation, while numerous less-qualified white U.S. born and bred male employees have been awarded these positions and the commensurate compensation. In addition, since complaining about this discriminatory conduct, Plaintiff has been the subject of illegal retaliatory conduct including, but not limited to, being demoted and having his professional discretion significantly curtailed.

90.     The reason that Plaintiff has not received raises and promotions that he had and has earned and to which he was and is entitled is that Plaintiff is the victim of pervasive, intentional, discriminatory conduct.

91.     Plaintiff is entitled to be compensated by Citigroup for the substantial damages that he has incurred due to Citigroup's illegal discriminatory conduct, which Plaintiff reasonably believes to be in the amount of at least $38 million dollars.

92.     The ongoing discriminatory and retaliatory conduct also has caused severe emotional distress to Plaintiff, for which he is under medical care, and Plaintiff is entitled to compensatory damages for this emotional distress in an amount to be determined at trial.

93.     In addition, because Citigroup's discriminatory conduct was wanton, willful and in reckless disregard for the well-being of Plaintiff, Plaintiff is entitled to punitive damages in an amount not less than $100 million.

WHEREFORE, Plaintiff demands judgment in an amount not less than $38 million, plus interest, punitive damages in an amount not less than $100 million, compensatory damages for emotional distress in an amount to be determined at trial, costs and reasonable attorneys fees, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
        October 21, 2005

HELLER, HOROWITZ & FEIT, P.C.

By: _____
        Richard F. Horowitz (RH – 6452)
        Clifford J. Bond (CB – 4679)
    292 Madison Avenue
    New York, New York 10017
    (212) 685-7600

*Attorneys for Plaintiff*